# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
# MARTINSBURG

**ROXUL USA, INC.,**
a Delaware corporation,
d/b/a, "ROCKWOOL,"

    Plaintiff,

v.                                                                         **CIVIL ACTION NO.: 3:19-CV-54**
                                                                                           **(GROH)**

**BOARD OF EDUCATION**
**OF THE COUNTY OF JEFFERSON,**
a West Virginia county board of education,

    Defendant.

## MEMORANDUM OPINION AND ORDER OF HEARING
## GRANTING THE PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

On April 30, 2019, and May 1, 2019, the parties in the above-styled civil action appeared before the Court for a hearing on the Plaintiff's Motion for a Temporary Restraining Order or Preliminary Injunction. ECF No. 2. James A. Walls, Joseph V. Schaeffer and James C. Walls, III, appeared on behalf of the Plaintiff, Roxul USA, Inc. ("Rockwool"). Anthony J. Majestro and Courtney B. Harden appeared on behalf of the Defendant, Board of Education of the County of Jefferson ("BOE"). After reviewing the parties' briefs, considering the evidence presented, and carefully analyzing the controlling law, the Court **GRANTED** the motion for a preliminary injunction for the reasons provided herein.

## I. Background

This civil action arises from the BOE's threatened condemnation of Rockwool's 194-acre real property located in Ranson, West Virginia. The background of that dispute is as follows.

Rockwool is "the world's leading manufacturer of environmentally-friendly stone wool insulation." ECF No. 18 at 1. In late 2016, Rockwool began considering fifty sites as locations for its new manufacturing facility in the United States. Id. Rockwool was recruited to Ranson, West Virginia by a "wide array of state and local officials." Id. In connection with those recruiting efforts, local officials, including the BOE, offered Rockwool tax incentives if it agreed to build its new facility in Ranson, West Virginia. Id. Rockwool accepted that offer, and in October 2017, Rockwool entered into a Payment in Lieu of Taxes Agreement ("PILOT") with the BOE and others. See ECF No. 18-1.

In November 2017, Rockwool began site preparation and construction on its new facility. ECF No. 18 at 2. To date, Rockwool has spent more than $49 million on permitting, constructing and extending utilities to its new facility. Id.; see Peter Regenberg Hr'g Test. However, since beginning construction, Rockwool has faced significant public backlash, not present during the negotiation of the PILOT agreement, over health concerns related to the facility's potential emissions. For example, Jefferson County citizens have "implored the [BOE] to either oppose the building of Rockwool or to request additional information so that an informed decision could be made regarding student safety." ECF No. 34-3 at 4.

Despite having signed the PILOT agreement, demonstrating support for the Rockwool facility, the BOE now opposes the construction. Specifically, the BOE has

publicly withdrawn its support for the Rockwool facility, demanded a "non-negotiable" independent human health risk assessment, requested a moratorium on construction, and threatened to terminate the PILOT. ECF No. 34-3, 34-4. Most recently, on April 9, 2019, the BOE informed Rockwool that it intended to buy or condemn Rockwool's land, identifying the need for a Regional Student Support Center ("Student Support Center").

Thereafter, on April 12, 2019, Rockwool filed the complaint in this action seeking to enjoin the BOE from condemning its land. ECF No. 1. Contemporaneously, Rockwool filed a motion for a temporary restraining order or preliminary injunction. ECF No. 2. The Court scheduled a hearing on Rockwool's motion for April 30, 2019. ECF No. 5. After hearing all the evidence, the Court granted Rockwool's motion for a preliminary injunction for the reasons provided herein.

## II. Applicable Legal Standards

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (citing Munaf, 553 U.S. 674, 689-90 (2008)). To succeed on a motion for a preliminary injunction, the plaintiff must make a "clear showing" that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter, 555 U.S. at 20, 22. "All four requirements must be satisfied." Real Truth About Obama, Inc. v. Fed. Elec. Comm'n, 575 F.3d 342, 346 (4th Cir. 2009) (vacated and remanded on other grounds).

If the court grants a motion for a preliminary injunction it must: (1) state the reasons why the injunction was issued; (2) state the injunction's terms specifically; and (3) describe in reasonable detail the act or acts restrained or required. Fed. R. Civ. P.

65(d)(1). Additionally, the court may grant a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). In the Fourth Circuit, "this rule is mandatory and unambiguous." Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 421 (4th Cir. 1999). "Although the district court has discretion to set bond amount in such sum as the court deems proper, it is not free to disregard the bond requirement altogether." Id. "[F]ailure to require bond upon issuing injunctive relief is reversible error." Id.

### III. Findings of Fact and Conclusions of Law

Here, the Court found that an injunction was warranted because: (1) Rockwool is likely to succeed on the merits of its claims; (2) Rockwool is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in Rockwool's favor; and (4) an injunction is in the public interest. These issues are discussed in turn.

**A. Rockwool is likely to succeed on the merits of its claims.**

First, after reviewing the evidence and considering the arguments of counsel, the Court found that Rockwool was likely to succeed on the merits of its claims. Rockwool's first amended complaint presents three federal claims under 42 U.S.C. § 1983.[1] To succeed on the merits of these claims, Rockwool must show that: (1) a person acting under color of state law; (2) deprived it of its constitutional rights. It is undisputed that the BOE is a "person" for the purpose of § 1983 and that the BOE was acting under color of

---

[1] Rockwool's First Amended Complaint [ECF No. 18] also alleges six state law claims. However, Rockwool voluntarily dismissed all state law claims. ECF No. 27. Acknowledging that proper procedure would require Rockwool to amend its complaint, and finding that judicial economy warranted the amendment, the Court granted Rockwool leave to amend its complaint. Therefore, Rockwool proceeds in this action on Counts I, III and V of its first amended complaint—all of which allege federal constitutional claims.

4

state law when it sought to condemn Rockwool's property. Accordingly, the question becomes whether the BOE has deprived Rockwool of a constitutional right.

Rockwool alleges three constitutional violations. Specifically, Rockwool alleges that the BOE's actions violate Rockwool's substantive due process rights guaranteed by the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Takings Clause of the Fifth Amendment made applicable to the States through the Fourteenth Amendment. ECF No. 18 at 11.

Reviewing the applicable law, in <u>Lingle v. Chevron U.S.A., Inc.</u>, the Supreme Court held that the Fifth Amendment "is designed not to limit the governmental interference with property rights *per se*, but rather to secure compensation in the event of <u>otherwise proper interference</u> amounting to a taking." 544 U.S. 528, 537 (2005) (emphasis added). However, a taking cannot survive a due process challenge if it is "so arbitrary or irrational" that it "fails to serve any legitimate governmental objective." <u>Id.</u> at 542. "[I]f a government action is found to be impermissible—for instance because it fails to meet the 'public use' requirement or is so arbitrary as to violate due process—that is the end of the inquiry. No amount of compensation can authorize such action." <u>Id.</u> at 543.

Specifically, to succeed on a substantive due process claim, a plaintiff must show that: (1) he had a property interest; (2) the state deprived him of the property interest; and (3) the state's actions fall so far beyond "the outer limits of legitimate governmental action that no process could cure the deficiency." <u>Front Royal & Warren Cty Indus. Park Corp. v. Town of Front Royal</u>, 135 F.3d 275, 288 (4th Cir. 1998). Substantive due process is

intended to protect against state action that is "arbitrary or irrational" or "so unjustified by any circumstance or governmental interest." Id.

Under the Equal Protection Clause, state action is improper where the plaintiff "has been intentionally treated differently from others similarly situated" and there is "no rational basis" for the difference in treatment. Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (affirming the circuit court's decision that a plaintiff can allege an equal protection violation by "asserting that state action was motivated solely by a spiteful effort to get him for reasons wholly unrelated to any legitimate state objective."). Specifically, the plaintiff must show that the government action was not rationally related to a legitimate state interest. Front Royal, 135 F.3d at 290.

Upon careful review, the Court found that Rockwool presented sufficient evidence to clearly show that it was likely to succeed on the merits of its constitutional claims. First, the Court found that the Fifth Amendment presupposes that the state acted in pursuit of a valid purpose. Although the Court agreed that the BOE's claimed reason for the taking would constitute a public use—as the BOE stated it intended to build a school facility to meet the community's educational needs—the Court found that the BOE's actions lacked any legitimate government interest, were motivated by animus, and were arbitrary, capricious, and in bad faith, in violation of Rockwool's substantive due process and equal protection rights. In support of this finding, the Court relied on the following evidence presented at the hearing.

First, the Court emphasized that the BOE enticed Rockwool to locate in Ranson, West Virginia, through the PILOT agreement, signed in November 2017. In that agreement, the BOE stated that it believes the construction of Rockwool's facility in

6

Ranson would "promote the public interest and public purposes by, among other things, providing certainty and soundness in fiscal planning and promote the present and prospective prosperity, health, happiness, safety, and general welfare of the public school students in Jefferson County." ECF No. 18-1 at 3-4. The BOE made these representations, and watched Rockwool invest millions of dollars in construction, without any indication that Rockwool's property would be targeted for condemnation. This is true even though the BOE president, Kathy Skinner, testified that the BOE had an eye on the Rockwool property for a good place for a school or school center all along. See Kathy Skinner Hr'g Test. The Court found that Rockwool's detrimental reliance on the BOE's apparent support and the BOE's subsequent change of heart was so egregious as to shock the conscience and fall outside the legitimate bounds of governmental activity in violation of the Due Process Clause.

Based upon testimony from the Jefferson County Superintendent, a timeline of events developed with respect to the Rockwool condemnation. The Jefferson County Superintendent, Bondy Shay Gibson, admitted that, beginning in August 2018, the BOE started to receive significant public pressure to oppose the Rockwool facility. By email dated August 14, 2018, Superintendent Gibson informed Rockwool that, at the August board meeting, Jefferson County citizens "implored" the BOE to oppose the building of Rockwool. ECF No. 34-3 at 4. At that time, the BOE requested that Rockwool perform an independent human health risk assessment ("HHRA") and posted a public statement on its website regarding its concerns with the Rockwool facility. Id. at 5-6. While Rockwool agreed to move forward with the HHRA, it was evidently not on the terms requested by the BOE. In response, the BOE sent Rockwool a letter, dated February 7,

7

2019, in which the BOE stated that it would "pursue, any and all legal, ethical courses of action to oppose the enactment of the [PILOT]." ECF No. 34-4 at 2. While Rockwool immediately sought clarification on the BOE's letter [ECF No. 34-5 at 3], the BOE did not respond to Rockwool's request for clarification. Less than two months later, on April 9, 2019, the BOE notified Rockwool of its intent to condemn Rockwool's property for $1.3 million, a fraction of the over $49 million spent by Rockwool. ECF No. 18-2. Based on this timeline of events, the Court made the logical inference that the BOE's actions in condemnation were fueled by animus and directly in response to public outcry opposing the Rockwool facility.

The Court's finding was further supported by testimony regarding the alleged purpose for condemning the land. Specifically, Superintendent Gibson testified that the Rockwool property would be used for a Student Support Center. However, to date, the BOE has not held a single public meeting about the Student Support Center, or even identified the need for a Student Support Center to the public. When questioned about the Student Support Center, Superintendent Gibson could not definitively answer how big the facility would be, how many students it would serve, or what services would be offered. Although Superintendent Gibson testified that the facility needed to be located near Berkeley County so that Berkeley County (and potentially Morgan and Hampshire County) students could receive services at the facility, there are no formalized agreements in place with those counties or the schools therein. Even more compelling is that both Ms. Skinner and Superintendent Gibson testified that the idea for the Student Support Center did not come to fruition until February 2019—the same time or shortly

8

after the BOE told Rockwool that it would take "any and all legal, ethical courses of action" to oppose the facility.

In short, the Court found that very little, if any, forethought had been invested in the planning and preparation for the Student Support Center. What minimal forethought did occur took place in the two months since the BOE informed Rockwool that it would take any and all action to oppose its facility. All of this evidence supports the inference that the Student Support Center is nothing more than a pretext to conceal the BOE's real reason for condemning Rockwool's land—animus fueled by public pressure.

Lastly, the BOE's arbitrary and irrational conduct was apparent when the Court compared the evidence related to the BOE's other land purchases to the condemnation of Rockwool's property. The differences between the land acquisitions are striking. First, Superintendent Gibson and Ms. Skinner admitted that the BOE has <u>never</u> condemned property for school facilities in the past. While the BOE has made two other land purchases in the past several years, both were voluntary purchases.

In the first of these land purchases, the BOE purchased 155 acres of farmland ("the Strider property"). With respect to that purchase, Superintendent Gibson testified that the BOE had been "strategically planning the move for several years." ECF No. 34-2 at 1. First, "the Board began setting aside protected funding that could only be used for land and building purchase growth." Id. Moreover, "the Board was careful in researching the best property to meet the growing needs of the system." Id. "After narrowing the potential school sites to the top location, the district completed extensive soil sampling that ensured the piece of land could easily accommodate construction of three full schools at the lowest possible cost with no surprises." Id. Superintendent Gibson stated that the

9

BOE was "sure to do our due diligence . . . researching all of our options to find the one that is the absolute best deal for Jefferson taxpayers." Id.

In the second land purchase, the BOE purchased 101 acres in Shepherdstown, West Virginia ("the Shepherdstown property"). With respect to this purchase, the BOE President stated that "we have been looking diligently for two years to address the needs of Shepherdstown and the surrounding community." See Bondy Shay Gibson Hr'g Test. Additionally, the property was "chosen after a thorough geotechnical survey." Id.

With respect to both the Strider property and the Shepherdstown property, it is clear that the BOE expended significant time and energy choosing the appropriate land, funding the purchase, and determining the facilities that would be built thereon. In contrast, no testing has been done with respect to the Rockwool property, the BOE has not considered alternative sites, and there is no funding in place to build the Student Support Center. Unlike the other land purchases, the BOE's condemnation of the Rockwool facility is not a move that the BOE has been "strategically planning . . . for several years." Moreover, although the Court does not substitute its judgement for that of the BOE, the BOE certainly cannot say that it has "researched all of its options to find the one that is the absolute best deal for Jefferson taxpayers." Rather, building the Student Support Center on Rockwool's property will cost significantly more than other property in the area because the BOE will incur legal fees with respect to the condemnation and because the BOE will pay significant sums of money to decommission[2] the Rockwool property to make it suitable for the BOE's purposes. The Court found that these stark contradictions were further evidence of the BOE's irrational

---

[2] Decommissioning refers to the work that will need to be done to remove the construction already completed by Rockwool, including a significant network of underground piping.

and arbitrary conduct with respect to the condemnation, in violation of the Due Process Clause.

Accordingly, although each piece of evidence taken alone is not evidence of a constitutional violation, when taken together and in context, the Court found that, at best, the BOE's actions were so arbitrary or irrational as to violate due process. At worst, the BOE's actions were motivated by animus fueled by public pressure in violation of Rockwool's equal protection rights. Therefore, the Court found that Rockwool was likely to succeed on the merits of its claims.

**B. Rockwool is likely to suffer irreparable harm in the absence of preliminary relief.**

Next, the Court found that Rockwool is likely to suffer irreparable harm in the absence of preliminary relief. As Rockwool stated in its motion and as found by the Court in its ruling, Rockwool depends upon its new Ranson facility for "much-needed production capacity." ECF No. 3 at 8. Rockwool began its search for a new factory site in 2016, and the Ranson factory is scheduled to open in mid-2020, "just in time to supply products to meet customer demand." Id. Currently, Rockwool is spending approximately $1 million per week in construction and is just beginning the above-ground phase of work. See Peter Regenberg Hr'g Test. As construction is occurring at such a rapid pace, even a short moratorium on construction could significantly impact the completion date for Rockwool's factory.

The Court found that, if Rockwool cannot open its factory on time due to construction delays, then Rockwool's ability to meet customer demand will be crippled. The Court further found that Rockwool's inability to meet demand would have not only an immeasurable financial impact on Rockwool, but also on Rockwool's customers. The

11

Court held that, under Fourth Circuit precedent, these sorts of damages are both immeasurable and irreparable. See East Tenn. Nat. Gas Co. v. Sage, 361 F.3d 808, 829 (4th Cir. 2004). Accordingly, the Court found that Rockwool is likely to suffer irreparable harm in the absence of preliminary relief.

### C. The balance of the equities tips in Rockwool's favor.

Third, the Court found that the balance of equities tips in Rockwool's favor. First, with respect to Rockwool, the Court reiterated that Rockwool would be dramatically and immeasurably impacted by construction delays. In contrast, with respect to the BOE, the Court found that granting the injunction may delay construction on the Student Support Center. However, the Court found that these potential damages are entirely speculative because the BOE has many steps it must take before it can begin building the Student Support Center. First, the BOE cannot begin construction on the Student Support Center until it receives funding. According to Ms. Skinner's testimony, this funding will come in part from a bond that will not appear for a vote until the Fall, and which may succeed or fail. Moreover, even assuming the BOE had the money today, it still needs architectural plans, permits, and more. Lastly, even without a preliminary injunction, the condemnation proceeding would take months to conclude in state court. Accordingly, the Court found that the BOE can have no real expectation of beginning construction on the facility prior to the conclusion of this action, and therefore, delaying construction until a decision can be reached on the merits presents no real hardship.

The Court also considered the additional decommissioning costs that the BOE might incur as a result of this injunction. In so considering, the Court emphasized that the BOE only initiated the condemnation proceeding last month. Thus, the BOE should have

been aware that the property would come with significant decommissioning costs. Moreover, these additional decommissioning costs can be recouped through the bond that the Court set, should it be determined that the injunction was improvidently granted. Accordingly, the Court found that the balance of the equities tips in favor of Rockwool.

**D. An injunction is in the public interest.**

Finally, the Court found that an injunction is in the public interest for two reasons. First, the Court held that the public has a strong interest in protecting private property rights against bad faith and arbitrary and irrational government action. As Rockwool persuasively argued in its brief, a government entity should not be permitted to "weaponize its condemnation authority against disfavored members of society." ECF No. 3 at 9. The Court emphasized that the BOE's actions have been directly motivated by public pressure beginning in August 2018. From this finding, the Court held that the BOE should not be permitted to use its condemnation power against an entity, solely because it was found "undesirable by a vocal portion of the community."

Second, the Court found that the PILOT agreement raises a public interest concern. Specifically, the Court found that BOE voluntarily entered into an agreement with Rockwool to encourage development. Rockwool relied on that agreement and, to date, has spent millions of dollars in construction. Significantly, Rockwool has spent large sums of money to fulfill its portion of the PILOT agreement, such as oversizing utility which benefits the BOE as intended by the PILOT. After Rockwool expended over $49 million in reliance on the PILOT agreement, the BOE attempted to condemn the land for even less than Rockwool initially paid for the raw land. The Court held that it is against the public interest to back out on such an agreement because it discourages future

13

development, which harms the community as a whole. Accordingly, the Court found that a preliminary injunction is in the public interest.

## IV. Conclusion

For all the reasons provided herein, the Court found that a preliminary injunction was warranted. Specifically, the Court **GRANTED** the Plaintiff's Motion for a Preliminary Injunction [ECF No. 2] because: (1) Rockwool is likely to succeed on the merits; (2) Rockwool is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in Rockwool's favor; and (4) an injunction is in the public interest. Having granted the injunction, the Court necessarily defined the terms of the injunction and set an appropriate bond.

First, with respect to the **terms of the injunction**, the Court **ORDERED** that the Defendant, the Jefferson County Board of Education, is enjoined and prohibited from any activity, both existing and future, in furtherance of condemning the Plaintiff's property in Jefferson County, West Virginia.

Next, with respect to **bond**, the Court **ORDERED** that bond be set at $3.5 million. Because the Defendant was not prepared with a sum certain concerning the damages it may sustain as a result of the preliminary injunction—if it were later determined that the injunction was improvidently granted—the Court **GRANTED** the Defendant **LEAVE** to file a motion to reconsider the bond at a later date, if the Defendant deemed it necessary.

The Clerk is **DIRECTED** to transmit copies of this Order to all counsel of record herein.

**DATED:** May 7, 2019

/s/ Gina M. Groh
GINA M. GROH
CHIEF UNITED STATES DISTRICT JUDGE